UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IRIS GOLDFARB,                          :
                                        :
        Plaintiff,                      :
                                        :
v.                                      :    No. 3:03CV00862(DJS)
                                        :
TOWN OF WEST HARTFORD,                  :
ET AL.,                                 :
                                        :
        Defendants.                     :
                                        :
                                        :

MEMORANDUM OF DECISION AND ORDER

Plaintiff, Iris Goldfarb ("Goldfarb") brings this action
against the Town of West Hartford ("the Town"), James Strillacci
("Strillacci"), Carl Rosensweig ("Rosensweig"), J.A. Garewski
("Garewski"), Joseph LaSata ("LaSata") and Stephen B. Estes
("Estes") (collectively, "Defendants") pursuant to 18 U.S.C. §
1983, alleging violations of her rights under the Fourteenth
Amendment to the United States Constitution, and pursuant to
Connecticut common law, claiming intentional infliction of
emotional distress.  Now pending are two motions for summary
judgment, one filed by the Strillacci, Rosensweig, Garewski,
LaSata, and Estes[1] **(dkt. # 58)**, and one filed by the Town **(dkt. #
59)**.  For the reasons stated herein, both motions (dkt. #s 58 &
59) are **GRANTED.**

---

[1]The court shall refer to Strillacci, Rosensweig, Garewski, LaSata and
Estes collectively as "the Individual Defendants."

**I. FACTS**

On October 2, 1983, the Town hired Goldfarb to work as a Public Safety Dispatcher in the Emergency Reporting Center ("the ERC") of the West Hartford Police Department ("WHPD").  At all times relevant to this case, the following information applied to the Individual Defendants: Strillacci was the Chief of Police in West Hartford; Rosensweig was an Assistant Chief of Police in West Hartford whose responsibilities included supervision of the Patrol Division, of which the ERC is a part; Garewski was a Captain in the West Hartford Police Department who was responsible for the Patrol Division; LaSata was a Lieutenant in the Police Department with responsibilities in the Patrol Division; and Estes was a Sergeant in the Police Department with responsibilities in the Patrol Divison.

Goldfarb claims that, since 1984, she has suffered from a serious and chronic medical condition that, for all times relevant to this case, her doctors were not able to diagnose.[2] According to Goldfarb, this medical condition causes the following symptoms: fever, aching eyes, body aches, headaches, sore throat, swollen glands, exhaustion, nausea, vomiting, reflux, indigestion, digestion problems, diarrhea, dizziness,

---

[2]In her deposition testimony, Goldfarb states that, subsequent to the events relevant in this case, her infectious disease doctor diagnosed her as suffering from chronic fatigue syndrome and fibromyalgia. (See dkt. # 59-1, Mem. of Law in Support of Def.'s Mot. for Summ. J., Ex. A, Goldfarb Dep. at 186:25-187:9.)

vertigo, memory loss, confusion, insomnia, nightmares, severe anxiety, and depression.

At various times throughout the course of her employment, Goldfarb was absent from work because of her symptoms.  Beginning in 1996 and through the end of her employment, Goldfarb exhausted all or nearly all of her contractual allotment of sick leave for each fiscal year.  During some years, she was required to use other accrued leave, such as vacation and holiday time, after depleting her sick leave.  Goldfarb's attendance issues were well known in the WHPD, to the point which a phrase was coined to describe her absences: "the Iris Virus."  Goldfarb complains that Garewski was aware of rumors and informal complaints being made about Goldfarb's absenteeism, but he made no effort to investigate or respond to them, which caused Goldfarb "embarrassment and emotional distress."  Nevertheless, Goldfarb has admitted that her frequent and extended absences likely contributed to tension among her ERC co-workers because of the inconvenience and disruption to their schedules caused by their having to cover Goldfarb's shifts.

Since at least 1991, WHPD administrators have expressed concerns regarding Goldfarb's attendance and the pattern of Goldfarb's use of her sick time.  At the end of 2001, Rosensweig conducted an analysis of Goldfarb's absences for the preceding two years and determined that many of Goldfarb's unscheduled

absences for reported illnesses were contiguous with her scheduled vacations, holidays, and regularly-scheduled days off. After conducting this analysis, Rosensweig wrote to Goldfarb a letter, dated January 29, 2002, in which he reviewed her attendance record and noted that, in the previous two years, Goldfarb had called in sick several times when she had already exhausted her sick leave.  In that letter, Rosensweig advised Goldfarb that: (1) in light of the pattern of Goldfarb's use of sick time, the WHPD would, for at least the next year, require Goldfarb to submit medical certification for any sick leave taken; and (2) any vacation, holiday, or compensatory leave was to be scheduled in advance, approved by a supervisor, and not used as sick leave.[3]

On January 29, 2002, Rosensweig handed to Goldfarb his January 29, 2002 letter during a meeting with Goldfarb.  In that meeting, Goldfarb apparently informed Rosensweig of her medical condition.  Goldfarb admits that she cannot identify any person in the WHPD administration to whom, prior to that day, she had reported that she had a chronic medical condition that caused her repeated pattern of absences.  After hearing about Goldfarb's medical condition, Rosensweig pressed Goldfarb for specifics

---

[3]Rosensweig subsequently wrote to Goldfarb a second letter, dated February 5, 2002, in which he advised Goldfarb to disregard the portion of his January 29, 2002 regarding her requirements for taking vacation, holiday, or compensatory leave because such requirements conflicted with a 1996 agreement between Goldfarb's union and the Town.

regarding her illness, including what her diagnosis was.  In this
meeting, Rosensweig asked questions such as, "Why are you out of
work so much?", "What is wrong with you?", and "What is your
illness?", but Goldfarb did not provide that information,
apparently because she had not received a diagnosis for her
medical condition.  Goldfarb claims that Rosensweig's questioning
of her after the point at which she believed she had adequately
explained her situations constituted harassment.  In addition,
although Goldfarb admits that, prior to January 29, 2002, she did
not have any problems with Rosensweig or Garewski (who also may
have attended the meeting), she claims that, as early as January
1993, she complained that a refusal by then-Assistant Chief
Carucci to allow her to exchange sick leave for holiday leave
constituted "ongoing harassment."

Shortly after learning of Goldfarb's claim of having a
chronic illness, Rosensweig suggested that Goldfarb contact the
Town's Human Resources Department to find out what options may be
available to her.  Goldfarb states that she met with Patricia
Morowsky ("Morowsky"), an employee with the Town's Human
Resources Department, who apparently informed Goldfarb that
certain absences may be covered under the Family and Medical
Leave Act ("FMLA").  Morowsky wrote to Goldfarb a letter, dated
April 16, 2002, in which Morowsky both noted the Town's
acknowledgment that Goldfarb's medical circumstances met the

definition of a "chronic condition" requiring treatment under the FMLA, and outlined the provisions (including requirements and benefits) of the FMLA.  Goldfarb states that, prior to her meeting with Rosensweig and contact with Morowsky, she had been unaware that she could use FMLA-protected leave for absences from work due to a serious medical condition.

Goldfarb subsequently began to file for FMLA leave when she took time off from work due to her medical condition.[4]  According to Goldfarb, after she began using the FMLA for her absences, Rosensweig, Garewski, LaSata, and Estes engaged in "harassing behavior" toward her, which Goldfarb claims is attributable to her use of FMLA leave.  Goldfarb maintains that this harassment included her being questioned about the nature of her illness and her symptoms.  According to Goldfarb, such questioning, which lasted for several weeks, was in direct contradiction to the instructions provided by Morowsky, who allegedly told Goldfarb that Goldfarb was permitted to respond to inquiries about her absences by saying "It's FMLA," and nothing more.  Goldfarb specifically mentions one occasion when she called in sick where she asked the lieutenant on the telephone (a non-party to this case) why he always asked her what she was sick with, even though Morowsky allegedly told Goldfarb that she need only say "It's

---

[4]On April 17, 2002, Goldfarb had a fainting spell at work and was transported to the hospital.  Goldfarb admits that this event did not prevent her from working after that day.

FMLA."  Goldfarb claims that the lieutenant responded by saying
that Rosensweig had instructed them to ask such questions.
Goldfarb also claims that she called Morowsky about the
questioning, and Morowsky said that she would "take care of it."
After this conversation with Morowsky, the questions about
Goldfarb's symptoms apparently stopped.

Goldfarb also claims that during the period of time after
which she began taking FMLA leave, more and more of her co-
workers became less and less friendly with her.  According to
Goldfarb, her absences, and the talk surrounding her absences,
caused her co-workers to get "colder and colder as time went on."
Goldfarb insists that Garewski "should have been squelching
that."  She further maintains that Rosensweig was "tolerating and
allowing the rest of the supervisors to not stop what was going
on," even though she never brought to his attention that her co-
workers were treating her in a "hostile manner."  Goldfarb also
asserts that the same holds true for Strillacci, i.e., that he
was aware of the problem and was "allowing it all to happen,"
even though she had never made any complaints to him.

With regard to LaSata, Goldfarb claims that LaSata was
"deliberately rude and harassing" to her by refusing to speak
with her or turning around to avoid saying hello to her when she
came to work.  Goldfarb also states that, when she called in
sick, LaSata was "very rude and abrupt on the phone" by speaking

-7-

to her in a disgusted tone of voice and then hanging up on her without saying goodbye.  Goldfarb admits, though, that she cannot recall anything specific that LaSata said to her that she considered to be rude, offensive, or harassing, and that she is not aware of LaSata making any derogatory announcements of her absences.

Goldfarb maintains that, between April 17, 2002 and February, 2003, Estes harassed her by "overly critiquing" her work as a dispatcher, including confronting and disparaging Goldfarb in front of her co-workers.  Goldfarb states that she complained to her supervisors about this alleged harassment by Estes, but that her complaints were never treated as "formal" complaints or investigated because her complaints were "only verbal."  Goldfarb also states that if Estes answered the telephone when she called in sick, or when her father called in sick for her, Estes would let out a sigh of disgust and remark, "Oh, the nightly phone call."  According to Goldfarb, when her father called in sick for her, her father would always identify himself at the beginning of the conversation and explain that Goldfarb was unable to work, but Estes would nevertheless respond by asking who was making the call and what the problem was.  In addition, Goldfarb claims that on one occasion when she called in sick, Estes, "in a derogatory way," announced in the ERC something to the effect of "Guess who called out again?"

Goldfarb recounts one incident involving Estes and Garewski that, in Goldfarb's estimation, constituted harassment.  On February 2, 2003, Goldfarb's father, who was returning Goldfarb's car to Goldfarb, entered into the ERC to wait for Goldfarb. Goldfarb's father had brought his dog along with him into the ERC.  Estes, upon seeing Goldfarb's father in the ERC, demanded that Goldfarb tell her father to leave the ERC because he did not have permission to be there.  Goldfarb told Estes that she would not remove her father.  Estes then told Goldfarb that if she did not make her father leave, then he (Estes) would throw her father out.  Goldfarb responded to Estes by saying "The fuck you will. He's only here to pick me up."  Goldfarb admits to using profanity toward Estes, and she admits that this constituted insubordination.  For her part, Goldfarb states that Estes had gone into a "angry rage", and that Estes's body language, facial expression, and demeanor caused Goldfarb to be fearful that Estes would assault her or her father.

Goldfarb claims that, on other occasions, Goldfarb's father had waited in the ERC for her, but the officers (apparently, lieutenants) in charge during those occasions did not object to his presence, even though they were aware of it.  Garewski, upon hearing that certain lieutenants permitted Goldfarb's father to wait in the ERC, sent to Goldfarb a memorandum, dated February 24, 2003, which instructed Goldfarb to identify the lieutenants.

Goldfarb did not respond to this request.[5]  On February 26, 2003, however, Goldfarb told Garewski that she would not give him the information he requested because she "would not rat on the lieutenants."

Goldfarb claims that Estes's and Garewski's conduct regarding this incident constituted harassment, and, for a period of time beginning in March, 2003, Goldfarb received treatment for mental or emotional issues from a clinical social worker, Linda Berger.  Goldfarb claims that, as a result of Estes's conduct, she was unable to work from February 2, 2003[6] until May 14, 2003. Goldfarb then returned to work for two days; however, her attorney then told her "she had to leave," and Goldfarb reported to her supervisor that she "could not continue her duties." Goldfarb thereafter requested, and was granted, a discretionary two-week leave so that she could get through the end of fiscal year 2002-2003.  Goldfarb admits that, from the date on which she was told by her attorney she had to leave work through October 2,

_____

[5]The parties disagree over how to characterize Garewski's "request." Defendants maintain that Garewski, who was responsible for the ERC, issued an "order," whereas Goldfarb insists that Garewski did not issue an "order."  The court shall use the term "request."

[6]There appear to be inconsistencies regarding this date.  In Goldfarb's Rule 56(a)(2) statement, under "Plaintiff's Statement of Disputed Material Facts," Goldfarb indicates that "she was unable to return to work from February 2, 2003 [the date of her argument with Estes], until May 14, 2003." (Dkt. # 87, Pl.'s Fed. R. Civ. P. 56(a)(2) Statement, p. 7 ¶ 21.)  Yet, in Paragraph 48 of the Individual Defendants' Rule 56(a)(1) statement, the date given is not February 2, 2003, but February 26, 2003, which is the date she spoke with Garewski (see dkt. # 58-2, Individual Defs.' Local Rule 56(a)(1) Statement ¶ 48), and Goldfarb admits to this paragraph in her Rule 56(a)(2) statement (see dkt. # 87, Pl.'s Fed. R. Civ. P. 56(a)(2) Statement, p. 7 ¶ 21).  This discrepancy shall not, however, affect the court's decision here.

2003, which was the date she was eligible to retire, she did not return to work.

According to Goldfarb, the above-described facts (which, she admits, are all of the events of harassment or of a hostile work environment that she can recall), constitute violations of her Fourteenth Amendment rights.  She also asserts that Defendants intentionally caused her emotional distress.

## II. DISCUSSION

Goldfarb alleges that Defendants violated her Fourteenth Amendment equal protection and substantive due process rights. She also brings, pursuant to Connecticut common law, an allegation of intentional infliction of emotional distress. Although Goldfarb claims that she was discriminated against because of her use of FMLA leave, she does not bring a claim based on the FMLA itself.[7]

There are two pending motions for summary judgment.  The first motion was filed by the Individual Defendants, and the second motion was filed by the Town.  Both motions argue that Goldfarb's substantive claims must fail.  The Individual Defendants also argue that they are entitled to qualified immunity, and the Town argues that, as a municipality, it is free from liability.  The court shall first address the arguments

---

[7]On May 13, 2004, the court denied Goldfarb's request to file her Second Amended Complaint, which would have added claims under the FMLA, the First Amendment, and the Fourteenth Amendment.  (See dkt. # 41, Ruling on Mot. for Leave to Amend.)

common to all Defendants, and then, if need be, discuss any
arguments specific to the Individual Defendants and the Town.

## A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue of material fact and that the
moving party is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the
nonmoving party "has failed to make a sufficient showing on an
essential element of [its] case with respect to which [it] has
the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317,
323 (1986).  "The burden is on the moving party 'to demonstrate
the absence of any material factual issue genuinely in dispute.'"
American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d
348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins.
Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if
evidence is such that a reasonable jury could return a verdict
for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist.,
963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986)).  The Court must view all
inferences and ambiguities in a light most favorable to the

nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d
Cir. 1991).  "Only when reasonable minds could not differ as to
the import of the evidence is summary judgment proper."  Id.

   B. First and Second Counts: Equal Protection

In the First Count of her Amended Complaint, Goldfarb
asserts that "[t]he acts of the [Individual Defendants], under
color of law, by virtue of their authority as Police supervisors
and public servants of the Town of West Hartford, herein alleged
constitute a denial to [Goldfarb] of the equal protection of the
law as guaranteed . . . by the Fourteenth Amendement . . . ."
(Dkt. # 12, Am. Compl. ¶ 36.)  In the Second Count of her Amended
Complaint, Goldfarb asserts that the conduct of Rosensweig and
Strillacci "became the custom, decision, and policies of the Town
of West Hartford for the purpose of violating [Goldfarb's]
rights," thus causing Goldfarb "to be unlawfully deprived of
rights secured to her by the United States Constitution and by
Title 42 United States Code § 1983 . . . ."  (Id. ¶¶ 43-44.)

The Fourteenth Amendment to the United States Constitution
provides that "[n]o state shall . . . deny to any person within
its jurisdiction the equal protection of the laws."  U.S. Const.
amend. XIV, § 1.  The Supreme Court has held that the Equal
Protection Clause is "essentially a direction that all persons
similarly situated should be treated alike."  City of Cleburne,
Tex. v. Cleburne Living Ctr. Inc., 473 U.S. 432, 439 (1985).

"Traditionally, the Equal Protection clause of the Fourteenth Amendment protects against [classification-based] discrimination." Inturri v. City of Hartford, 365 F. Supp. 2d 240, 248 (D. Conn. 2005).  That is to say, the courts

> apply different levels of scrutiny to different types
> of classifications.  At a minimum, a statutory
> classification must be rationally related to a
> legitimate governmental purpose. . . . Classifications
> based on race or national origin . . . and
> classifications affecting fundamental rights . . . are
> given the most exacting scrutiny. Between these
> extremes of rational basis review and strict scrutiny
> lies a level of intermediate scrutiny, which generally
> has been applied to discriminatory classifications
> based on sex or illegitimacy.

Clark v. Jeter, 486 U.S. 456, 461 (1988) (internal citations omitted).  As the Second Circuit has pointed out, rational basis review generally applies, whereas the higher forms of review (i.e., strict scrutiny and intermediate scrutiny) apply in the "limited circumstances" where "the subject of the different treatment is a member of a class that historically has been the object of discrimination." Able v. United States, 155 F.3d 628, 631-32 (2d Cir. 1998).

In this case, however, Goldfarb does not base her equal protection claim pursuant to the "traditional," i.e., classification-based, equal protection analysis, nor does she argue that she has been discriminated against because she is a member of one of the classifications traditionally protected by strict or intermediate scrutiny under the Equal Protection

Clause.  Rather, she relies on "two related, yet different, equal protection arguments."  Cobb v. Pozzi, 363 F.3d 89, 109 (2d Cir. 2004).  First, Goldfarb asserts a "class of one" equal protection claim based on the Supreme Court's decision in Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  Second, following the Second Circuit's opinion in LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980), Goldfarb claims that she has been denied equal protection as a result of malicious or bad faith intent to injure her, i.e., "malicious prosecution."  The court shall analyze both arguments in turn.

### 1. Olech "Class of One"

The Supreme Court "recognize[s] successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Olech, 528 U.S. at 564.  Courts should allow plaintiffs to bring "class of one" claims because "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  Id. (internal quotation marks omitted).

"In order to succeed on a 'class of one' claim, the level of

-15-

similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." <u>Neilson v. D'Angelis</u>, 409 F.3d 100, 104 (2d Cir. 2005). "[T]he standard for determining whether another person's circumstances are similar to the plaintiff's must be . . . whether they are *prima facie* identical." <u>Id.</u> at 105 (internal quotation marks omitted); <u>see</u> <u>Inturri</u>, 365 F. Supp. 2d at 251 (holding that, to be considered similarly situated, "employees must be similarly situated in all material respects.") (internal quotation marks omitted). The Second Circuit requires a "class of one" plaintiff to show that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

<u>Neilson</u>, 409 F.3d at 105. "[T]his test is simply an adaptation of the rational review standard applicable to equal protection 'class of one' cases." <u>Id.</u> at 105 n.3; <u>see</u> <u>Weinstein v. Albright</u>, 261 F.3d 127, 140 (2d Cir. 2001) (noting that rational basis review applies to equal protection claims not based on plaintiff's membership in a suspect class or on effects of the challenged action on fundamental rights).

Although Goldfarb, in her submissions to the court, set forth the standard for a "class of one" equal protection claim, she has not meet that standard. To support such a "class of one"

claim, Goldfarb was required to demonstrate that there were other employees who were similarly situated to her in all material respects.  Although "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury[,] . . . [t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (internal citations omitted).  With regard to Goldfarb's claims here, the court finds that no reasonable jury could determine that Goldfarb has met the "similarly situated" prong.

The court, in reading Goldfarb's materials, found few instances where Goldfarb even mentions other employees who may have been similarly situated to her.  In her Rule 56(a)(2) statement, under "Plaintiff's Statement of Disputed Material Facts," Goldfarb states that "[a] former dispatcher in the ERC, Marilyn Jankowski, was made fun of by co-workers because of her medical issues and the Defendants made no effort to enforce the code of conduct with respect to her."  (Dkt. # 87, Pl.'s Fed. R. Civ. P. 56(a)(2) Statement, p. 8 ¶ 27) (hereinafter, "the Disputed Facts Statement"); (see dkt. # 59-1, Ex. A, Goldfarb Dep. at 186:12-24.)  This Disputed Facts Statement, even if accepted as true, is wholly inadequate to show that Marilyn

-17-

Jankowski ("Jankowski") was similarly situated to Goldfarb in all material respects. The Disputed Facts Statement does not provide any specifics regarding Jankowski's medical issues or the amount of sick time Jankowski took, let alone demonstrate how Jankowski was similarly situated to Goldfarb. In fact, the Disputed Facts Statement statement does not even mention whether Jankowski took FMLA-protected leave at all.[8] The court thus fails to see how Jankowski can be considered a similarly situated for the purposes of Goldfarb's "class of one" claim here.[9]

In addition to mentioning Jankowski in her Rule 56(a)(2) statement, Goldfarb, in her November 21, 2005 affidavit, states that she was "aware that in 2002 and 2003 there were many other employees in the ERC who took sick time; none was treated with animosity by our supervisors, subjected to special scrutiny in doing their jobs, questioned closely about their medical symptoms, spoken to with rudeness or contempt, demeaned, degraded, or threatened." (Dkt. # 88, Pl.'s Exs. Supp. L. Civ. R. 56(a)(2) Statements, Goldfarb Aff. ¶ 8) (hereinafter, "Affidavit Statement"). This Affidavit Statement, like the

---

[8]In her deposition, Goldfarb states that she could remember only one other employee in the ERC who may have taken FMLA leave, but that she was not certain that this other employee did actually take FMLA leave. (See dkt. # 59-1, Mem. of Law in Support of Def.'s Mot. for Summ. J., Ex. A, Goldfarb Dep. at 185:15-186:11.)

[9]The court also fails to see how using Jankowski as an example a similarly situated employee would help Goldfarb's Olech "class of one" equal protection claim because, based upon the Disputed Facts Statement, it appears that Defendants treated Jankowski and Goldfarb in the same manner, not differently.

Disputed Facts Statement, is insufficient to support Goldfarb's claims here.  The Affidavit Statement fails to specify, for example, who these other employees were, what duties they had in the ERC, what kind of sick leave they took, why they took sick leave, or for how long they took their sick leave.  Indeed, aside from making the assertion that these employees worked in the ERC, the Affidavit Statement fails to set forth how these "many other employees" were in any way similarly situated to Goldfarb in all material respects.  Goldfarb has provided no evidence from which a jury could reasonably find that other ERC employees who took sick or FMLA leave were prima facie similarly situated to her. Therefore, even when viewing all inferences and ambiguities in a light most favorable to Goldfarb, Goldfarb's "class of one" equal protection claim must fail.  Consequently, with regard to the "class of one" equal protection claims in the First and Second Counts of Goldfarb's Amended Complaint, Defendants' motions for summary judgment are **GRANTED**.

2. LeClair "Selective Prosecution"

In LeClair and its progeny, the Second Circuit has provided an equal protection argument that plaintiffs may use as an alternative to the "class of one" standard set forth by the Supreme Court in Olech.[10]  In this circuit, a plaintiff may bring an equal protection claim by demonstrating "selective

---

[10]The court notes that LeClair was, in fact, decided before Olech.

prosecution."  To succeed in an equal protection action based
upon a selective prosecution, plaintiffs in this circuit must
show both "(1) that they were treated differently from other
similarly situated individuals, and (2) that such differential
treatment was based on impermissible considerations such as race,
religion, intent to inhibit or punish the exercise of
constitutional rights, *or malicious or bad faith intent to injure
a person*."   Harlen Assocs., 273 F.3d at 499 (emphasis added)
(internal quotation marks omitted); see LeClair, 627 F.2d at
609-10.  The Second Circuit has warned, though, that "cases
predicating constitutional violations on selective treatment
motivated by ill-will, rather than by protected-class status or
an intent to inhibit the exercise of constitutional rights, are
lodged in a murky corner of equal protection law in which there
are surprisingly few cases and no clearly delineated rules to
apply."  Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005)
(internal quotation marks omitted).  Indeed, the Second Circuit
has  "frequently referred to the LeClair formulation in [this]
circuit, . . . but rarely [has] found a constitutional
violation."  Id. (collecting cases).

Although Goldfarb makes numerous assertions regarding how
Defendants' conduct toward her was motivated by animosity and ill
will, she has again failed to compare herself to a similarly
situated employee.  As one court in this circuit has stated,

-20-

demonstrating that a plaintiff has been treated differently from similarly situated individuals is "the *sine qua non* of a <u>LeClair</u> 'selective enforcement' violation." <u>John Doe No. 1 v. Village of Mamaroneck</u>, --- F. Supp. 2d ----, 2006 WL 3393247, at *34 (S.D.N.Y. 2006).  The court need not recite those few instances where Goldfarb attempts to compare herself to other employees. <u>See</u> <u>supra</u> Part II.B.1.  Needless to say, as with her "class of one" claim, Goldfarb's comparisons here fall far short of sufficiently showing that, for the purposes of a "selective enforcement" equal protection claim, she was similarly situated to any fellow employees.  Therefore, Goldfarb's "selective enforcement" equal protection claim fails.  Consequently, with respect to the "selective prosecution" equal protection claims in the First and Second Counts of Goldfarb's Amended Complaint, Defendants' motions for summary judgment are **GRANTED**.

      C. First and Second Counts: Substantive Due Process

In the First Count of her Amended Complaint, Goldfarb also asserts that "[t]he acts of the [Individual Defendants], under color of law, by virtue of their authority as Police supervisors and public servants of the Town of West Hartford, herein alleged constitute a denial to [Goldfarb] of her substantive due process rights as guaranteed . . . by the Fourteenth Amendement . . . ."

(dkt. # 12, Am. Compl. ¶ 35.)[11]  In the Second Count of her
Amended Complaint, Goldfarb asserts that the conduct of
Rosensweig and Strillacci "became the custom, decision, and
policies of the Town of West Hartford for the purpose of
violating [Goldfarb's] rights," thus causing Goldfarb "to be
unlawfully deprived of rights secured to her by the United States
Constitution and by Title 42 United States Code § 1983 . . . ."
(Id. ¶¶ 43-44.)

"Substantive due process is an outer limit on the legitimacy
of governmental action." Natale v. Town of Ridgefield, 170 F.3d
258, 263 (2d Cir. 1999).  The Supreme Court has emphasized "that
the touchstone of due process is protection of the individual
against arbitrary action of government . . . whether the fault
lies in a denial of fundamental procedural fairness, . . . or in
the exercise of power without any reasonable justification in the
service of a legitimate governmental objective." County of
Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998) (internal
quotations and citations omitted).  With regard to substantive
due process,

---

[11]The court points out that Goldfarb, in her memorandum of law in
opposition to Defendants' motions, does not appear to make any specific
arguments regarding her substantive due process claims.  Nevertheless,
Goldfarb does make assertions regarding the wrongfulness of Defendants'
conduct.  Therefore, although the court could consider Goldfarb's substantive
due process claims to be abandoned and grant summary judgment in favor of
Defendants on those claims, see Taylor v. City of New York,269 F. Supp. 2d 68,
75 (E.D.N.Y. 2003), the court shall instead consider Goldfarb's assertions to
be arguments in support of her substantive due process claims and analyze
these assertions as such.

> [t]he Supreme Court has enunciated two alternative
> tests by which substantive due process is examined.
> Under the first test, the plaintiff must prove that the
> governmental body's conduct "shocks the conscience."
> . . . Under the second test, the plaintiff must
> demonstrate a violation of an identified liberty or
> property interest protected by the Due Process Clause.

DeLeon v. Little, 981 F. Supp. 728, 734 (D. Conn. 1997) (internal

citations omitted).  The court shall analyze Goldfarb's claims

under both tests.

### 1. "Shocks the Conscience"

"[N]ot all wrongs perpetrated by a government actor violate

due process."  Smith ex rel. Smith v. Half Hollow Hills Cent.

School Dist., 298 F.3d 168, 173 (2d Cir. 2002).  "For a

substantive due process claim to survive . . ., it must allege

governmental conduct that 'is so egregious, so outrageous, that

it may fairly be said to shock the contemporary conscience.'"

Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005) (quoting

Sacramento, 523 U.S. at 847 n.8); see Smith, 298 F.3d at 173

("The protections of substantive due process are available only

against egregious conduct which goes beyond merely 'offend[ing]

some fastidious squeamishness or private sentimentalism' and can

fairly be viewed as so 'brutal' and 'offensive to human dignity'

as to shock the conscience.") (internal quotation marks omitted).

Although the courts "tend to speak of that which 'shocks the

conscience' largely in the context of excessive force claims

. . . . it can apply to other areas of government activity as

well . . . ." Velez, 401 F.3d at 93-94 (internal citations omitted).  "'[M]alicious and sadistic' abuses of power by government officials, intended to 'oppress or to cause injury' and designed for no legitimate government purpose, 'unquestionably shock the conscience.'" Id. at 94 (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 252 (2d Cir. 2001)).  The courts use the "shock the conscience" test because "our constitutional notion of due process rests on the bedrock principle that we must protect the individual 'against . . . the exercise of power without any reasonable justification in the service of a legitimate governmental objective." Id. (quoting Sacramento, 523 U.S. at 845-46).

With regard to Rosensweig and Strillacci, Goldfarb maintains that Rosensweig himself harassed her, and that both Rosensweig and Strillacci tolerated the allegedly wrongful treatment she received at work.  Specifically, Goldfarb claims that Rosensweig's conduct at the January 29, 2002 meeting, during which Rosensweig asked questions about the nature of Goldfarb's medical condition, was harassment.  Goldfarb also claims that Rosensweig wrongfully instructed her supervisors to ask her what she was sick with when she called in sick.  In addition, Goldfarb asserts that, after she began taking her FMLA leave, her co-workers became less friendly to her, and Rosensweig and Strillacci tolerated the situation by not having Goldfarb's

supervisors "stop what was going on."

The court finds that none of Goldfarb's allegations against Rosensweig or Strillacci rises to the level of a substantive due process violation.  Considering the circumstances involved, Rosensweig's questioning of Goldfarb during the January 29, 2002 meeting does not "shock the conscience."  Goldfarb had a history of frequent absences from work, and the court does not see how it was unreasonable for Rosensweig to inquire about the nature of Goldfarb's medical condition, especially in light of the fact that Goldfarb could not name or otherwise identify her illness. As for Rosensweig allegedly instructing his subordinates to question Goldfarb even after she had invoked the FMLA, such conduct, even assuming that the Town had a policy against asking such questions, was not "brutal" or "offensive to human dignity."[12]  In addition, with respect to Rosensweig's and

---

[12]The court is highly doubtful of Goldfarb's proposition that once she mentioned the FMLA as the basis for taking a sick day, all further questioning about that sick time must have ceased.  The court does not read into the FMLA this almost magical-like power whereby, once the FMLA is invoked, Goldfarb is protected against all inquiries.  Indeed, employers should question employees about their FMLA leave because, as the Code of Federal Regulations states, it is, "[i]n all circumstances, . . . the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying . . . ." 29 C.F.R. § 825.208(a). "An employee giving notice of the need for unpaid FMLA leave must explain the reasons for the needed leave so as to allow the employer to determine that the leave qualifies under the Act. If the employee fails to explain the reasons, leave may be denied."  Id. § 825.208(a)(1).  In addition, with regard to unforeseen FMLA leave (which, based on the facts here, appears to be the type of leave Goldfarb took), "[t]he employer will be *expected* to obtain any additional required information through informal means. The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter . . . ."  Id. § 825.303(b) (emphasis added).  That is, "Once an employer receives sufficient notice that the eligible employee is requesting leave for a FMLA-qualifying reason, the employer bears the burden to gather any additional information necessary for the leave to fall within the FMLA."  Brenneman v. MedCentral Health Sys., 366

Strillacci's "toleration" of the situation in which Goldfarb's
supervisors's did not "stop what was going on," (i.e., the cold
treatment Goldfarb was receiving from her co-workers), Goldfarb
has presented no evidence that their conduct was a "malicious and
sadistic" abuse of power "intended to oppress or to cause injury"
to Goldfarb.

With regard to Garewski, Goldfarb's allegations are as
follows: (1) Garewski was aware of, but did not investigate or
respond to, rumors, gossip (including the use of the phrase "the
Iris Virus," which was coined to describe Goldfarb's absences)
and informal complaints made about Goldfarb's absenteeism, thus
causing Goldfarb "embarrassment and emotional distress"; (2)
Garewski did not "squelch" the cold treatment Goldfarb was
receiving from her co-workers, which created an uncomfortable
working environment for Goldfarb; and (3) Garewski requested that
Goldfarb identify those supervisors who allowed Goldfarb's father
into the ERC, and such a request constituted harassment.  The
court finds each of these allegations insufficient to demonstrate

---

F.3d 412, 422 (6th Cir. 2004); see Garraway v. Solomon R. Guggenheim Found.,
415 F. Supp. 2d 377, 383 (S.D.N.Y. 2006).  In fact, an employer can require,
in some circumstances, that a request for FMLA leave be supported by
certification by a health care provider.  See 29 U.S.C.A. § 2613.
        It would be unreasonable to require Defendants, after Goldfarb invoked
the FMLA, to stop making any inquiries about Goldfarb's reasons for calling in
sick.  In all fairness, Defendants should have been permitted to determine, at
the very least, whether Goldfarb was taking FMLA leave because of her chronic
illness or for some other reason.  The court thus fails to see how such
questioning, which not only falls far short of "brutal" conduct that "shocks
the conscience," but which also, based upon relevant statutory and case law,
could very well have been mandated by the FMLA, violated Goldfarb's
substantive due process rights.

substantive due process violations.  Again, none of the above-described conduct was "brutal" or "offensive to human dignity," and Goldfarb has presented no evidence that Garewski maliciously or sadistically intended to cause injury to Goldfarb.

With regard to LaSata, Goldfarb claims that he was "rude and harassing" to her by refusing to speak with her, turning his back to avoid saying hello to her, and, when on the telephone, speaking to her in a disgusted tone of voice and hanging up without saying goodbye.  These allegations are, in sum, a complaint that LaSata was not as friendly to Goldfarb as she would have liked.  The court, unaware of any constitutional directive requiring that all co-workers be courteous, does not see how LaSata's alleged conduct, although not particularly friendly, and quite possibly offensive to Goldfarb's private sentimentalism, could be considered violations of Goldfarb's constitutional rights.

With regard to Estes, Goldfarb alleges that he harassed her by: (1) "overly critiquing" her work; (2) being rude on the telephone whenever she (or her father on her behalf) called in sick; (3) on one occasion when she took sick leave, announcing, in a derogatory way, "Guess who called out sick again?" in the ERC; (4) on February 2, 2003, ordering Goldfarb to remove her father from the ERC.  Again, none of these allegations can support Goldfarb's substantive due process claims.  "Overly

-27-

critiquing" someone's work does not normally implicate the brutality required to demonstrate a substantive due process violation, and Goldfarb has presented no evidence as to what Estes's allegedly unfair critiques were.  Goldfarb's allegations about Estes's allegedly rude behavior on the telephone, and about his rude comment in the ERC, are insufficient for the same reasons that her allegations against LaSata are insufficient.

As for the February 2, 2003 incident involving Estes ordering Goldfarb to remove her father from the ERC, the court fails to see how Estes's conduct was "so egregious" or "so outrageous" that it "may fairly be said to shock the contemporary conscience."  Estes was Goldfarb's superior.  He had some responsibility for the ERC, in which the general public is apparently (and understandably) not permitted to enter or wander.  There is no indication that Goldfarb's father had license to be in the ERC; he obviously did not have Estes's permission.  Estes told Goldfarb that she had to remove her father.  Goldfarb refused, and Estes said that if she did not do so, then he would.  Goldfarb then used profanity toward Estes, an act that Goldfarb admits was insubordination.  Even assuming that Estes went into an "angry rage" (and it is not necessarily beyond the pale for a supervisor to severely reprimand a subordinate who refuses an order and uses profanity), Estes's conduct during this incident did not constitute a substantive due process violation.

Goldfarb has not presented any evidence demonstrating that the Individual Defendants violated her substantive due process rights under the "shocks the conscience" test.  Therefore, because she has not, under this test, demonstrated violations of her substantive due process rights by the Individual Defendants, her claims fail with regard to the Town as well.  Consequently, with regard to the "shocks the conscience" substantive due process claims in the First and Second Counts of Goldfarb's Amended Complaint, Defendants' motions for summary judgment are **GRANTED**.

2. "Identified Liberty or Property Interest"

"[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985).  The court must determine whether the facts of this case demonstrate a deprivation of these rights.[13]

Goldfarb has not set forth an interest of which Defendants have deprived her.  The term "liberty"

> denotes not merely freedom from bodily restraint but
> also the right of the individual to contract, to engage
> in any of the common occupations of life, to acquire
> useful knowledge, to marry, establish a home and bring
> up children, to worship God according to the dictates
> of his own conscience, and generally to enjoy those

---

[13]The facts of this case obviously do not involve a deprivation of Goldfarb's interest in "life," so the court need not discuss this substantive interest.

> privileges long recognized . . . as essential to the
> orderly pursuit of happiness by free men.

Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 572

(1972)(internal quotation marks omitted).  There is little doubt

that "[i]n a Constitution for a free people, . . . the meaning of

'liberty' must be broad indeed."  Id.  Nevertheless, the court

does not believe that Goldfarb asserts anything here that is a

deprivation of a liberty interest because her claims do not even

resemble a loss of a long-recognized privilege "essential to the

orderly pursuit of happiness."

Thus, Goldfarb must be claiming that she was deprived of a

property interest.  "The Fourteenth Amendment due process

guarantee . . . only extends to property claims to which an

individual has a 'legitimate claim of entitlement.'" N.Y. State

Nat'l Org. for Women v. Pataki , 261 F.3d 156, 164 (2d Cir. 2001)

(quoting Roth, 408 U.S. at 577).  That is, Goldfarb must

demonstrate that she possessed "a property interest of

constitutional dimension."  Furlong v. Shalala, 156 F.3d 384, 393

(2d Cir. 1998).  "A cognizable property interest is more than

just a 'unilateral expectation,'" id., and does not include

"trivial and insubstantial interest[s]," Ezekwo v. NYC Health &

Hosps. Corp., 940 F.2d 775, 783 (2d Cir. 1991).  Indeed, "[t]o

have a property interest in a benefit, a person clearly must have

more than an abstract need or desire for it."  Roth, 408 U.S. at

577.

"Identifying the relevant property interest is . . . a two-step process." O'Connor v. Pierson, 426 F.3d 187, 196 (2d Cir. 2005). "First, [the court] must determine whether some source of law other than the Constitution, such as a state or federal statute, confers a property right on the plaintiff." Id. "Once such a property right is found, we must determine whether that property right 'constitutes a property interest for purposes of the Fourteenth Amendment.'" Id. (quoting Town of Castle Rock v. Gonzales, 545 U.S. 748, 125 S.Ct. 2796, 2803 (2005)). For example, "it is well established that the state-law property interest of government employees who may only be discharged for cause, such as tenured teachers, is a constitutionally protected property interest for purposes of the Fourteenth Amendment." Id.

The only potential property interest that the court can glean from the facts of this case regards Goldfarb's employment with the WHPD. Goldfarb has not provided any arguments or evidence demonstrating that she had a constitutionally protected property interest in her employment with the WHPD. For argument's sake, however, the court assumes that Goldfarb, who had been employed by the Town for approximately twenty years, did have such an interest. It is not enough, though, to simply have this interest. Goldfarb must also show that Defendants somehow violated, or deprived her of, that interest.

Goldfarb was not fired. Indeed, Goldfarb admits that she

retired, (see dkt. # 88, Pl.'s Exs. Supp. L. Civ. R. 56(a)(2)
Statements, Goldfarb Aff. ¶ 10), which means that she was not
*actually* discharged.  She does intimate, though, that she was
"constructively discharged."  Goldfarb states that, although she
became eligible to retire in October 2003, she "had no specific
plans to retire at that time."  (Dkt. # 87, Pl.'s Fed. R. Civ. P.
56(a)(2) Statement, p. 8 ¶ 28.)  Instead, she "would have
continued to work if she had been happy in her position.
However, the conduct of the Defendants and the exacerbation of
her illness caused by Defendants forced her to retire at that
time."  (Id.)  The court can thus construe Goldfarb's statements
as arguing that she was constructively discharged from her
employment.

     "Courts have typically addressed actual, not constructive,
deprivations of protected interests."  Larkin v. Town of West
Hartford, 891 F. Supp. 719, 728 (D. Conn. 1995).  "Nevertheless,
courts have recognized that Fourteenth Amendment deprivations can
be constructive as well as actual."  Id.  "In due process cases,
employment law has provided guidance on constructive discharge."
Id.  Employment law states that

     [c]onstructive discharge of an employee occurs when an
     employer, rather than directly discharging an
     individual, intentionally creates an intolerable work
     atmosphere that forces an employee to quit
     involuntarily. . . .  Working conditions are
     intolerable if they are so difficult or unpleasant that
     a reasonable person in the employee's shoes would have
     felt compelled to resign.

Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996) (internal quotation marks and citations omitted); see Brittell v. Dep't of Corr., 247 Conn. 148, 178 (1998). "Intolerability of working conditions is based on an objective standard of whether a reasonable person in the employee's position would have felt compelled to resign.  An employee's subjective opinion that his or her working conditions are intolerable is not sufficient to establish constructive discharge."  Etienne v. Wal-Mart Stores, Inc., 186 F. Supp. 2d 129, 136 (D. Conn. 2001) In addition, "a reasonable employee will usually explore . . . alternative avenues thoroughly before coming to the conclusion that resignation is the only option." Larkin, 891 F. Supp. at 728.  "Alternatives include filing a grievance or threatening to quit if changes are not made."  Id. at 729. If a plaintiff does not pursue alternatives short of resignation, it may "indicate[] that retirement was not [her] only option."  Id.

        The court finds that the working conditions alleged by Goldfarb would not lead a reasonable person to feel compelled to resign, nor were these conditions intentionally created to make Goldfarb's working environment intolerable.  Goldfarb's assertions that her co-workers treated her in a cold or rude manner, and that there were rumors and informal complaints about her, are not sufficient to support a claim of constructive

discharge.  See Etienne, 186 F. Supp. 2d at 136 ("a plaintiff's
allegation that she was treated coldly . . . and that her
supervisors would not look or speak to her was insufficient to
find constructive discharge. . . . [because such] treatment,
though potentially unpleasant, was not significantly offensive
. . . .") (internal quotation marks omitted).  Goldfarb's
allegations regarding the manner in which her supervisors handled
her co-workers' cold-shoulder treatment toward her, and their
rumors about her, are also insufficient to support a claim of
constructive discharge.  Assuming that Goldfarb's supervisors had
an affirmative duty to "squelch" any such treatment (and the
court notes that, although Goldfarb has referred to a "code of
conduct,"  she has submitted no evidence of such a code or duty),
and assuming that Goldfarb lodged complaints with her supervisors
(and the court also notes that there is little evidence that she
did so), she has not presented, as she must, any evidence
suggesting that her supervisors' handling of the situation "was
part of a *deliberate* attempt to make her working conditions
intolerable."  Wilburn v. Fleet Fin. Group, Inc., 170 F. Supp. 2d
219, 239 (D. Conn. 2001) (emphasis in original).  As the Second
Circuit has pointed out, "ineffective or even incompetent . . .
handling of [such complaints] . . . does not rise to the level of
deliberate action required by [Second Circuit] precedent."
Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d

Cir. 2000).

None of the other alleged treatment by Goldfarb's supervisors rises to the level of constructive discharge because Goldfarb has not demonstrated that her supervisors' actions were part of an intentional attempt to make her working conditions intolerable.  Estes's "overly critiquing" of Goldfarb's work is not sufficient to show constructive discharge.  See Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993) ("[A] constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work").  In addition, the incidents Goldfarb recounts regarding her supervisors asking her questions about her chronic medical condition, Estes telling Goldfarb to remove her father from the ERC, or Garewski asking Goldfarb to divulge the names of those supervisors who had allowed Goldfarb's father to be in the ERC, although unpleasant for Goldfarb, do not demonstrate an intentional attempt to make her working conditions intolerable.  See id. ("Nor is the test [for constructive discharge] merely whether the employee's working conditions were difficult or unpleasant.")

Put simply, Goldfarb's working conditions, with which she was not "happy," can be described fairly as Goldfarb being on unfriendly terms with her co-workers and supervisors.  The court cannot require co-workers to be friends.  Additionally, the court

does not see how Goldfarb's supervisors could have forced
Goldfarb's co-workers to be friendly toward her.  The working
conditions Goldfarb claims she experienced, although
disagreeable, would not lead a reasonable person to, in an
objective sense, feel compelled to resign.  Moreover, Goldfarb
has not demonstrated that any of her supervisors' conduct was
intentionally designed to cause an intolerable working
environment.  Therefore, the court finds that Goldfarb was not
constructively discharged, and her substantive due process
claims, insofar as they are based on a deprivation of her right
to life, liberty, and property, fail as a matter of law against
all Defendants.  Consequently, with regard to the "identified
liberty or property interest" substantive due process claims in
the First and Second Counts of Goldfarb's Amended Complaint,
Defendants' motions for summary judgment are **GRANTED.**

D. Qualified Immunity and Municipal Liability

The court has found that the Individual Defendants did not
violate Goldfarb's equal protection or substantive due process
rights.  Therefore, the court need not discuss whether the
Individual Defendants are entitled to qualified immunity.  <u>See</u>
<u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001) ("A court required to
rule upon the qualified immunity issue must consider . . . this
threshold question:  Taken in the light most favorable to the
party asserting the injury, do the facts alleged show the . . .

-36-

conduct violated a constitutional right?  . . . If no
constitutional right would have been violated were the
allegations established, there is no necessity for further
inquiries concerning qualified immunity.").  In addition, as the
court has found that the Individual Defendants did not violate
Goldfarb's constitutional rights, the court need not discuss
whether the Town is liable under the theory of municipal
liability as set forth by the Supreme Court in  Monell v. Dep't
of Soc. Servs. of N.Y., 436 U.S. 658 (1978).  See Amnesty Am. v.
Town of West Hartford, 361 F.3d 113, 125 (2d Cir. 2001)
("Demonstrating that the municipality itself caused or is
implicated in the constitutional violation is the touchstone of
establishing that a municipality can be held liable [under
Monell] for unconstitutional actions taken by municipal
employees.").  Because the court has found no violation of
Goldfarb's constitutional rights here, summary judgment is
**GRANTED** in favor of Defendants with regard to all of Goldfarb's
constitutional claims.

   E. Third Count: Intentional Infliction of Emotional Distress

      In the Third Count of her Amended Complaint, Goldfarb
alleges that "[t]he defendants, each and all of them, intended to
inflict severe emotional distress upon the plaintiff, and knew or
should have known . . . that their acts or omissions . . . would
result in severe emotional distress to [Goldfarb]."  Goldfarb

further alleges that "[t]he acts and omissions of the defendants
. . . were extreme and outrageous," and that "[a]s a direct and
proximate result of said acts or omissions, [Goldfarb] suffered
severe emotional distress."  According to Goldfarb, Defendants'
conduct "violate[d] rights and duties established by the common
law of the State of Connecticut."

With respect to intentional infliction of emotional distress
claims, the Connecticut Supreme Court has stated that, in order
to recover damages on this theory,

> [i]t must be shown: (1) that the actor intended to
> inflict emotional distress; or that he knew or should
> have known that emotional distress was a likely result
> of his conduct; (2) that the conduct was extreme and
> outrageous; (3) that the defendant's conduct was the
> cause of the plaintiff's distress and (4) that the
> emotional distress sustained by the plaintiff was
> severe.

Peytan v. Ellis, 200 Conn. 243, 253 (1986), superseded by statute
on other grounds as recognized in Chadha v. Charlotte Hungerford
Hosp., 272 Conn. 776 (2005).  "Whether a defendant's conduct is
sufficient to satisfy the requirement that it be extreme and
outrageous is initially a question for the court to determine."
Appleton v.  Bd. of Educ. of Town of Stonington, 254 Conn. 205,
210 (2000).  "'Liability has been found only where the conduct
has been so outrageous in character, and so extreme in degree, as
to go beyond all possible bounds of decency, and to be regarded
as atrocious, and utterly intolerable in a civilized community.'"
Id. at 210-11 (citing 1 Restatement (Second) of Torts § 46,

comment (d) (1965)).

Goldfarb's allegations do not meet this standard. Goldfarb's allegations could not, as a matter of law, give rise to a claim for intentional infliction of emotional distress.  The court shall not detail the facts again, but the evidence in the record demonstrates that Goldfarb had been questioned about her chronic medical condition and about her FMLA leave, critiqued in her work, treated coldly (and possibly rudely) by co-workers, ordered to remove her father from the ERC, and asked to identify supervisors who had allowed her father into the ERC.  None of these facts support the allegation that the Town or its employees acted in an extreme and outrageous manner that is atrocious and utterly intolerable to a civilized community.  Goldfarb's claim of intentional infliction of emotional distress fails as a matter of law.  Consequently, with regard to the Third Count of Goldfarb's Amended Complaint, Defendants' motions for summary judgment are **GRANTED**.

### III. CONCLUSION

For the foregoing reasons, the Motion by Individual Defendants for Summary Judgment **(dkt. # 58)** is **GRANTED**, and the Town's Motion for Summary Judgment **(dkt. # 59)** is **GRANTED**. Judgment in favor of James Strillacci, Carl Rosensweig, J.A. Garewski, Joseph LaSata and Stephen B. Estes shall enter on the First and Third Counts of the Amended Complaint.  Judgment in

favor of the Town of West Hartford shall enter on the Second and Third Counts of the Amended Complaint.  The Clerk of the Court shall close this file.

**SO ORDERED** this <u>1st</u> day of February, 2007.


_____/s/DJS_____

DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE